**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE COMMISSION,

                         Plaintiff,

       - v -                                Civ. No. 1:10-CV-513
                                            (NAM/RFT)

MATTHEW JOHN RYAN and
PRIME RATE AND RETURN, LLC,
individually and doing business as
AMERICAN INTEGRITY FINANCIAL CO.,

                        Defendants.

UNITED STATES OF AMERICA,

                        Intervenor.

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **U.S. Securities & Exchange Commission**<br>3 World Financial Center<br>New York, New York 10281<br>*Attorney for Plaintiff* | Preethi Krishnamurthy, Esq. |
| **Matthew John Ryan**<br>125 South Road<br>Cropseyville, New York 12052<br>*Defendant, Pro Se* | |
| **Lemery Greisler LLC**<br>50 Beaver Street<br>Albany, New York 12207<br>*Receiver for Defendant Prime Rate and Return, LLC* | Paul A. Levine, Esq. |
| **The Bosman Law Firm, L.L.C.**<br>6599 Martin Street<br>Rome, New York 13440<br>*Attorney for Bosman & Associates, PLLC* | Beth A. Locastro, Esq.<br>T. Padric Moore, Esq. |

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## <u>MEMORANDUM-DECISION and ORDER</u>

On May 3, 2010, the Securities and Exchange Commission (hereinafter "SEC") filed a Complaint against Matthew John Ryan (hereinafter "Ryan") and Prime Rate and Return, LLC (hereinafter "Prime Rate"), seeking to stop an alleged ongoing fraud purportedly being perpetrated by these Defendants upon senior citizens who were seeking fixed income investments. Dkt. No. 1, Compl. Concurrent with filing the Complaint, the SEC filed a Motion for a Temporary Restraining Order, Dkt. No. 5, which resulted in the Honorable Norman A. Mordue, Chief United States District Judge, issuing an Order to Show Cause and an Order freezing assets and temporarily appointing Paul A. Levine, Esq., as Receiver for Prime Rate, Dkt. No. 6. Ultimately, based upon a joint Stipulation, a Preliminary Injunction was imposed, which directed, *inter alia*, that Levine shall serve as Receiver over Prime Rate and all entities it controls with the penultimate responsibility to "succeed to all rights to manage all properties owned or controlled by Prime Rate," to control all of the assets, books, records, and documents, to preserve the *status quo*, to ascertain the extent of commingling of funds and assets, and to prevent dissipation of assets. Dkt. No. 11, Stip. & Consent Order (hereinafter Prelim. Inj.), dated June 7, 2010, at ¶¶ IV & V.

Prior to the issuance of the Preliminary Injunction, Bosman & Associates PLLC (hereinafter "Bosman & Associates") provided legal advice to Ryan, Prime Rate, and its associated businesses. However, the Injunction eventually restrained and enjoined Bosman & Associates, as well as others, from transacting further business with and on behalf of Prime Rate and the collective entities. In exercising the duties and responsibilities delegated to him, Levine sought from Bosman & Associates approximately eight (8) specific items, which would be expected to be found within the

law firm's files regarding Prime Rate.  When Bosman & Associates would not cooperate with the

Receiver's request by providing the files or information, Levine appealed to this Court to intervene.

Dkt. No. 17, Rec. Lt-Mot. to Intervene, dated June 22, 2010.  Bosman & Associates opposed the

Receiver's Motion, raising that since it was owed more than $32,000 for services rendered, it had

both a charging and retaining lien on the files, and, by virtue of these liens, it would not be sharing

the files nor revealing related information to the Receiver.  Dkt. No. 23, Bosman & Assocs. Lt.-Br.,

dated July 1, 2010.

Because of this discovery imbroglio, the Court directed further briefing and set a Hearing

date.  On September 30, 2010, the Receiver filed a Pre-Hearing Statement and Memorandum of

Law.  Dkt. No. 45.  On October 7, 2010, both Ryan and Bosman & Associates filed their respective

Opposition thereto, Dkt. Nos. 52, Bosman's Mem. of Law,[1] 54, Ryan's Lt.-Mem., to which  Levine

filed a Reply on the following day, Dkt. No. 55, Rec. Reply Mem. of Law, dated Oct. 8, 2010.  The

Hearing was convened on October 13, 2010, and all of the issues were exhaustively discussed on

the record.  During the Hearing the Court ruled on several issues and reserved as to others, all of

which will be fully expounded upon herein.

## I.  BACKGROUND

The records reveals that Ryan, who has worked in the securities and insurance industry since

1997, served as the single member of Prime Rate, a limited liability company formed in 2001 under

the laws of Delaware.  Compl. at ¶¶ 10 & 11. At least in terms of this litigation, Prime Rate was

---

[1] Actually, the Bosman Law Firm's Opposition is comprised of the following: Dkt. Nos. 52, Mem. of  Law; 52-1, T. Padric Moore, Esq., Aff., dated Oct. 5, 2010; and, 52-2, Matthew John Ryan's Aff., dated Oct. 6, 2010.

doing business as American Integrity Financial Company (hereinafter "American Integrity").[2]  The

SEC's Complaint alleges that Ryan and Prime Rate raised approximately $6.5 million from investors

- mostly the elderly - by falsely promising them "guaranteed" fix rates of return ranging from 3.85%

to 9.35 %.  The SEC asserts that "American Integrity is a classic Ponzi scheme."  *Id*. at ¶ 1.  Because

of these allegedly fraudulent representations, which may have commenced as early as 2002, Ryan

and Prime Rate are accused of violating Section 17(a) of the Securities Act of 1933, Section 10(b)

of the Securities Exchange Act of 1934, and Sections 5(a) and (c) of the Securities Act.  *Id*. at ¶ 6.

The record also reflects that on August 18, 2009, both Ryan, in his individual capacity, and

Prime Rate signed a retainer agreement with Bosman & Associates, a general practice law firm.

Dkt. No. 23, Ex. A, Redacted Retainer Agreement.[3]  Because Bosman & Associates would only

provide Levine with a redacted version of the Retainer Agreement, the true extent of its

representation to both or either Ryan and Prime Rate over the past years is barely known.  But it is

safe to presume that the legal representation primarily concerned real estate closings, preparing legal

documents such as promissory notes, loan agreements, and mortgage notes, advising on other

business transactions, counseling on personal legal matters for Ryan, and conducting litigation on

behalf of both Ryan and Prime Rate.  *See* Dkt. Nos. 45, Exs. A-F, & 6, Order to Show Cause

Addendum.  The record indicates that Bosman & Associates may have approximately 121 files

related to Ryan and Prime Rate - approximately 93 archived files and 38 current files.  Dkt. No. 17,

Ex. A, Levine's Lt., dated May 25, 2010.  In Bosman & Associate's view, Ryan was the primary

---

[2]  Prime Rate also conducted business as "Low Cost Moving and Storage" and "Dirty Old Man," a handyman and trash removal business.  Dkt. No. 1, Compl. at ¶ 11.

[3]  Matthew J. Ryan signed this Retainer Agreement in both his individual capacity and as a representative of Prime Rate.  Dkt. No. 23, Ex. A.

client, that is, Prime Rate and Ryan were so inextricably intertwined that they are virtually indistinguishable.

Concurrently, albeit not intended as a coordinated endeavor with the SEC, a grand jury for the Northern District of New York returned a ten (10) count Indictment against Ryan which, based upon the same facts alleged in our Complaint, charges him with committing securities and mail fraud. Crim. Case No. 1:10-CR-319, Dkt. No. 1, Indict., dated June 18, 2010. Primarily concerned that discovery in this civil case may compromise the criminal prosecution of Ryan, the United States Attorney for the Northern District of New York filed a Motion to Intervene and a Stay of Discovery. Dkt. No. 33, U.S. Atty. Office's Mot. to Intervene, dated Sept. 8, 2010. Essentially, no objections were interposed against this Motion, *see* Dkt. Nos. 34 & 35, and accordingly Judge Mordue issued a Memorandum-Decision and Order granting the Motion to Intervene and staying Discovery pending the completion of the criminal prosecution, "except that Paul A. Levine, Esq., the Court-appointed Receiver, may continue to obtain discovery from third parties." Dkt. No. 57, Mem.-Dec. & Order, dated Oct. 8, 2010.

Section V of the Preliminary Injunction describes exhaustively how the Receiver is empowered to take control over all assets, "including all books, records, and documents, of Prime Rate," to preserve those records and documents, to assume all rights and powers set forth in the applicable management and LLC agreements, to take steps to locate assets, and to determine the disposition and use of funds. Dkt. No. 11, Prelim. Inj. Sec. V at pp. 5-9. When Levine approached Bosman & Associates for information, he was essentially seeking eight (8) discrete items: (1) a file list of the total universe of files; (2) a copy of the retainer agreement; (3) explanation of the settlement offer on the 669 Riverview Properties, Inc. matter; (4) copies of the EMC mortgage file;

(5) a copy of pleadings handled by Steve Waite, Esq., (6) details regarding the potential sale of property located on 5th Avenue, Troy, New York; (7) a copy of settlement with Sandy Horowitz; and, (8) information regarding deposits by Ryan and Prime Rate into the Bosman & Associates' escrow account. Dkt. No. 17, Ex. A, Levine's Lt., dated May 25, 2010.

Initially, the only issue submitted to the Court was whether the Bosman & Associates' charging and retaining liens should prevent Levine from obtaining possession of its files on behalf of Prime Rate. To date, Bosman & Associates is owed $32,604.67 in legal fees and disbursements. Dkt. No. 23 at p. 1. Furthermore, the law firm represented Prime Rate on an unrelated lawsuit where a settlement may be imminent. Because of both the pending litigation with a possible favorable outcome and the fact that Bosman & Associates possesses at least 121 relevant files, the law firm invokes it rights to both the statutory and common law liens. *See generally* Dkt. Nos. 23 & 52. However, in its subsequent filing, Bosman & Associates raises a host of other legal impediments to sharing any files with the Receiver. Dkt. No. 52. In addition to the legal liens, Bosman & Associates raises, *inter alia*, the attorney-client privilege chiefly held by its primary client Ryan as well as the Receiver's conflict of interest with Bosman & Associates as significant obstructions to disclosure. The law firm posits that if attorney-client privileged communications were to be invaded by the Receiver or if it was compelled to reveal such privileged communications, even by court order, grave ethical consequences would be visited upon it. *Id*.

## II. DISCUSSION

### A.  Discovery from Bosman & Associates

There are two fundamental principles we must dissect in order to determine if the Receiver is entitled to discovery of documents and data from Bosman & Associates. First, the Court must

ascertain whether Prime Rate and Ryan are so indelibly connected that they are essentially one and the same or, whether they are independent entities and, secondly, whether Levine, as the Receiver for Prime Rate, is, for all intents and purposes, currently Bosman & Associates' client who may legitimately make a request for the disclosure of information within the attorneys' files.

Bosman & Associates, as well as Ryan, clings to the notion that Ryan and Prime Rate are inseparable; *a fortiori*, Ryan is the client, not Prime Rate.  Basically, the law firm argues that whether Ryan sought legal assistance for his personal matters or as the sole member and representative of Prime Rate, Bosman & Associates responded solely to him without delineating between the two.  As a consequence, only Ryan can assert or waive the attorney-client privilege; therefore, Levine as the Receiver does not have legal standing to ask for the files or information related to either Ryan or Prime Rate.

Bosman & Associates is both factually and legally wrong.  Even though the Court is unable to fully evaluate the breadth of the law firm's representation, it is very clear, however, that at the time the Retainer Agreement was signed, Bosman & Associates was representing two clients, Ryan, individually, and Prime Rate.  Ryan signed the Retainer Agreement in both his individual capacity and official capacity as the sole member and agent of Prime Rate.  *See* Dkt. No. 23, Ex. A, Redacted Retainer Agreement.  The law as well leads the Court to reach the same conclusion.  Universally, both statutorily and through case precedents, limited liability companies, commonly known as LLCs, are formed as separate legal entities from the member(s).  6 Del.C § 18-201 ("A limited liability company formed under this chapter shall be a separate legal entity[.]");[4] *People v. Highgate LTC*

---

[4] Indeed, apparently all jurisdictions have deemed limited liability companies as an independent entities.  *See* N.Y. Ltd. Liab. § 203. A limited liability company is defined as an

(continued...)

*Mgm't, LLC*, 69 A.D.3d 185, 187 (N.Y. App. Div. 3d Dep't 2009) (noting that like a corporation, a limited liability corporation is a legal entity separate and distinct from the member); *see also In re 1545 Ocean Ave., LLC*, 72 A.D.3d 121, 126-28 (N.Y. App. Div. 2d Dep't 2010) (discussing the hybrid nature of a limited liability company).  More to the point, the interest of the member of an LLC is analogous to a shareholder in a corporation in that he or she has no interest in specific assets nor can be held liable for the company's debts or obligations. *Poore v. Fox Hollow Enter*., 1994 WL 150872, at *2 (Del. Super. Ct. Mar. 29, 1994) (citing 6 Del.C. §§ 18-303 & 18-701).  Accordingly, based upon the facts and the law, the Court concludes that Ryan and Prime Rate are not legally co-joined and stand autonomously from each other.

Now that the Court has determined that Prime Rate is an independent entity, our next inquiry is to ascertain if the Receiver steps into the proverbial shoes of Prime Rate, becoming a client of Bosman & Associates, who may have the right to seek its own files.  Again, both the facts and law compel only one observation:  Levine, as Receiver and successor to the management of Prime Rate, is indeed a client.  As a pure operation of law, Judge Mordue ordered as much, when he declared that Levine, as the Receiver for Prime Rate, succeeds to all current management of the entity and acts with the full force of the law as its sole representative collecting, managing, and if necessary, selling the assets, as well as  incurring and resolving related debt.  Prelim. Inj. Sec. V.  In fact, all of the Receiver's duties and responsibilities are broadly and comprehensively defined.  Although the successor interest was raised in another context before the United States Supreme Court,

---

[4](...continued)

unincorporated organization of one or more persons having limited liability. *In re 1545 Ocean Avenue, LLC*, 72 A.D.3d 121, 128 (N.Y. App. Div. 2d Dep't 2010).  In general terms, an LLC is a hybrid between the limited liability feature of a corporation and the managerial flexibility of a partnership.

*Commodity Futures Trading Comm'n v. Weintraub* stands for the proposition that when the control of a corporation passes to new management, the authority to assert certain privileges and rights passes as well. 471 U.S. 343 (1985);[5] *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 255 F.R.D. 98 (S.D.N.Y. 2008) (finding that successor management stands in the shoes of prior management and controls matters concerning the company's operation). In *United States v. Shapiro*, 2007 WL 2914218 (S.D.N.Y. Oct. 1, 2010), an analogous case, the SEC filed a civil action against a corporation and sought the appointment of a receiver. Following the reasoning in *Weintraub*, the court, in part, was called upon to consider which actor's duties most closely resembled those of the corporation's former management and concluded that it was the receiver/trustee. *Id.* at *5. For all of the above reasons, Levine, *de jure*, is consequently and currently a client of Bosman & Associates.

B.  Fifth Amendment of the United States Constitution

Among the many rights enumerated in the Fifth Amendment of the United States Constitution, it is guaranteed that, "no person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend V.  In light of the fact that Ryan has been indicted based on facts arising out of this lawsuit, Ryan possesses a right not to incriminate himself. But, in a rather broad, ill-informed, and ill-defined manner, Ryan argues, by virtue of his Fifth Amendment protection, that the Receiver should not have access to any of the files within Bosman & Associates' possession as such may relate to both he and Prime Rate. In support of his argument, Ryan expressed both in writing and during the Hearing that, with regard to certain loans and mortgages,

---

[5]  Regarding *Weintraub*'s impact on the attorney-client privilege, please see the discussion in Part II.C.

he was obligated to make personal guarantees to the lending institutions, which could very well be construed as incriminatory statements.  Without fully grasping the legal implications of this right, he presupposes that everything he has done regarding Prime Rate invariably involves this constitutional right.  But, as the following discussion will demonstrate, there are several reasons why Ryan's Fifth Amendment Right is not implicated.

The Fifth Amendment protects the person asserting the privilege only from compelled incrimination.  *United States v. Doe*, 465 U.S. 605, 610 (1984) (citation omitted).  In order to invoke the Fifth Amendment, "[t]he danger of self-incrimination must be real, not remote or speculative" and to the extent that the danger "is not readily apparent . . . the burden of establishing its existence rests on the person claiming the privilege." *Estate of Fisher v. Comm'r of Internal Revenue Serv.*, 905 F.2d 645, 649 (2d Cir. 1990) (citations omitted).  In those circumstances where the danger is not readily apparent, the judge's perception of the facts come into play as he assesses the credible basis of the party's invocation of the right; in doing so, the court must balance the credible basis in such a way as to not place too great a burden upon the explanation as would imperil the protection afforded by the privilege.  *OSRecovery v. One Groupe Int'l, Inc*., 262 F. Supp. 2d 302, 307 (S.D.N.Y. 2003).  Without a more specific identification as to what may be the compelled incriminatory statements, Ryan's postulations regarding this constitutional right are remote and speculative.

Generally, the Fifth Amendment does not protect business and personal documents, especially those that are voluntarily prepared, because their creation was never compelled.  *United States v. Doe*, 465 U.S. at 610 ("Where the preparation of business records is voluntary, no compulsion is present."); *Andresen v. Maryland*, 427 U.S. 463, 469 n.2 (1976) (observing that

business records seized and subsequently introduced into evidence at trial did not offend the Fifth Amendment).  But there may be a compelled testimonial aspect to producing documents under the "act of production" doctrine, and the Fifth Amendment may be applicable when an individual is being compelled "to produce documents where the production could implicitly communicate incriminating facts, such as the admission that 'papers existed, were in [production party's] possession or control, and were authentic.'" *United States v. Cianciulli*, 2002 WL 1484396, at *2 (S.D.N.Y. July 10, 2002) (quoting, *inter alia*, *United States v. Hubbell*, 530 U.S. 27, 36-37 (2000) (alteration in original)).  "While the contents of voluntarily prepared documents are not privileged, the act of producing them in response to a subpoena may require incriminating testimony in two situations: (1) 'if the existence and location of the subpoenaed papers are unknown to the government'; or (2) where production would 'implicitly authenticate' the documents." *In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992,* 1 F.3d 87, 93 (2d Cir. 1993) (internal citation omitted).  But we need not concern ourselves with the possibility that Ryan is being compelled to produce documents, because he is not.  The request to provide discovery is directed at his lawyers, not him, who are not representing him on this criminal and/or civil matters[6] and, moreover, it is business records that are being sought, not incriminating statements.  It is undisputed that these business records were voluntarily prepared and, as such, they are not protected by the Fifth Amendment.

There is yet one other permutation of the Fifth Amendment Privilege doctrine to be considered and that is the "required record exception."  When a person is required by law to create and maintain certain records and is asked to produce those records, the Fifth Amendment protection

---

[6] On the indictment, Ryan is represented by David Taffney, Esq.

against self-incrimination is unavailing.  "To qualify as a required record, a document must satisfy a three-part test: (1) it must be legally required for a regulatory purpose, (2) it must be of a kind that the regulated party customarily keeps, and (3) it must have assumed 'public aspects' which render it analogous to public documents."  *In re Doe v. United States*, 711 F.2d 1187, 1191 (2d Cir. 1983) (citing *Grosso v. United States*, 390 U.S. 62, 67-68 (1968)); *United States v. Cianciulli*, 2002 WL 1484396, at *3 (citations omitted).  Documents that fall within this rubric include real estate closing documents, loan and mortgage documents, promissory notes, escrow accounts, tax returns, and other related documents shared publically and/or with third parties, such as banks, lenders, or investors.

Pointedly, both the United States Supreme Court and the Second Circuit have continuously held that corporations and other artificially created collective entities do not have the authority to invoke a Fifth Amendment protection against incrimination.  *Braswell v. United States*, 487 U.S. 99, 102 (1988); *In re Grand Jury Supoena Issued June 18, 2009*, 593 F.3d 155, 157 (2d Cir. 2010) (citing *Braswell* for the proposition that "[u]nder the long-established 'collective entity rule,' corporations [and other similar type organizations] cannot avail themselves of the Fifth Amendment privilege"); *Armstrong v. Guccione*, 470 F.3d 89, 97 (2d Cir. 2006) (stating that it was bound to follow *Braswell*).  In this respect, the president of a corporation cannot interpose the Fifth Amendment to impede the production of corporate records, even if the act of production might prove personally incriminating.  *Braswell v. United States*, 487 U.S. 99.  And, should there be any doubt that an LLC is akin to a corporation and plagued with the same Fifth Amendment limitations, the Second Circuit and other courts within this Circuit have clearly addressed that distinction.  Whether it is a one-person corporation or a limited liability company, neither can avail itself of this Fifth Amendment protection.  *In re Grand Jury Supoena Issued June 18, 2009*, 593 F.3d at 158;

-12-

*OSRecovery, Inc. v. One Groupe Int'l, Inc*., 262 F. Supp. 2d at 311 (noting that the Fifth Amendment extends only to individuals and not collective entities such as a limited liability company).  Other Circuits have ruled similarly.  The Ninth Circuit, in a case very similar to our situation, found that a single member LLC should not be afforded Fifth Amendment protection.  *United States v. Feng Juan Lu*, 248 Fed.Appx 806 (9th Cir. 2007) (relying upon *Bellis v. United States*, 417 U.S. 85, 90 (1974) & *Braswell v. United States*, 487 U.S. at 108-09); *Expert Janitorial v. Williams*, 2010 WL 2854295, at *5 (E.D.Tenn July 19, 2010) (finding *Feng Juan Lu* to be well reasoned and thus applicable to its case).

In sum, there is no Fifth Amendment implications in our case because, (1) Prime Rate, as an LLC, cannot invoke the Fifth Amendment, (2) Ryan, as the single member and sole representative of Prime Rate, cannot cloak its records by his invoking his personal Fifth Amendment protection, (3) the records and information being sought are generally business in nature which were voluntarily prepared, (4) the records sought generally fall within the required record exception, and (5) Ryan is not being compelled to produce documents because they are not within his possession.

## C.  Attorney-Client Privilege

Suffering under the misconception that Ryan's intimate, intricate, and inextricable involvement in all matters, whether personal or Prime Rate, made him the exclusive client and thus the sole possessor of the attorney-client privilege,  Bosman & Associates raises this privilege as yet another legal barrier to sharing with Levine certain documents and revealing information about Prime Rate's legal business.  Bosman & Associates further posits that if it were to share such information, even if directed by a court,  it would be breaching its ethical responsibilities to its client

and could consequently be the subject to a legal malpractice lawsuit.[7]   Further, Bosman &
Associates seems to suggest that everything in its 121 files is protected by the attorney-client
privilege.  Because Ryan and Prime Rate are so intertwined and inter-connected, the law firm argues
that, even if Ryan and Prime Rate were legally independent of each other, it would remain virtually
impossible to separate the documents and delineate each party's sovereign privilege.  The Court
finds that Bosman & Associates' understanding of the facts in this case and attorney-client privilege
doctrine itself are inexact.

Our first mission is to make clear what constitutes this longstanding, common law privilege
that is recognized in New York and by the federal courts under FED. R. EVID. 501, as well as what

---

[7] During the Hearing, Bosman & Associates stated that it sought and received a legal opinion
as to this very issue from the New York State Appellate Division, Fourth Department.  Although no
written opinion was presented to this Court, Attorney LoCastro represented that the Fourth
Department believed that sharing these records with the Receiver would breach the attorney-client
privilege and the client's confidences and, therefore, would constitute a violation of the disciplinary
rules.    The Court acknowledges that attorneys are bound to keep private confidential
communications and secrets of their clients on the pain of professional discipline.  But, this Court
is not persuaded that such is the case here nor that the Fourth Department's opinion has any legal
sway in this matter.  First, this Court is confident that the New York State Appellate Division was
not presented with the same, full record that is before this Court nor did it have an opportunity to
weigh all of the Supreme Court and Second Circuit precedents that are directly on point and
controlling in our analysis.  We suspect that the question posed was more narrowly constructed, with
limited facts presented.  Secondly, the fear of an ethical lapse which would lead to malpractice
litigation is rather hyperbolic.  Should there be a court order directing the release of records to the
Receiver, Bosman & Associates would be either immune or exonerated from any potential liability
that may attach to exposing attorney-client privileged communication, should that be necessary.
Lastly, rarely, if ever, does a breach of the attorney-client privilege, by itself, generate a cause of
action.  *Madden v. Creative Servs., Inc.*, 51 F.3d 11 (2d Cir. 1995) (relying upon *Madden v. Creative
Servs, Inc*., 84 N.Y.2d 738 (1995), which held that New York does not recognize a tort action by a
client for an intruder's violation of the attorney-client privilege); *Sullivan & Cromwell LLP v.
Charney*, 15 Misc.3d 1128(A) (N.Y. Sup. Ct. 2007) ("Under New York law, an attorney's violation
of a disciplinary rules does not, by itself, give rise to a cause of action by his client for breach of
fiduciary duty, breach of contract, or legal malpractice.") (citations omitted).

it does not include.[8]  The privilege encourages full engagement between a party and his attorney so that full and frank communication exists to impart all the information an attorney may need in order to give sage and cogent advice on the matter.  *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998); *United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir. 1989) ("[The] communications between attorney and client endure as the oldest rule of privilege known to the common law."). Stated another way, its essential purpose is to encourage clients to be fully forthcoming with their attorney and to receive, in return, advice which will protect the clients' legal rights.  *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *United States v. Blizerian*, 926 F.2d 1285, 1292 (2d Cir. 1991); *Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ.*, 1996 WL 14448, at *4 (S.D.N.Y. Jan. 16, 1996) (citing, *inter alia*, *In re Horowitz*, 482 F.2d 72, 81 (2d Cir.), *cert. denied*, 414 U.S. 867 (1973)); *People v. Mitchell*, 58 N.Y.2d 368, 373 (1983).

When determining if there is in fact an attorney-client privilege present to cloak both the client's communication and the corresponding legal advice, a court needs to ascertain that this safety net attaches to only those communications (1) where legal advice of any kind is sought, (2) from a professional legal advisor in his or her capacity as such, (3) the communication relates to that purpose, (4) made in confidence, (5) by the client, and (6) are at his or her insistence permanently protected, (7) from disclosure by the client or the legal advisor, (8) except if the protection is waived.  *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 214 (2d Cir. 1997) (citing *In Re Grand Jury Subpoena Duces Tecum, Dated September 15, 1983*, 731 F.2d 1032, 1036 (2d Cir.

---

[8] The distinction between New York and federal law on the attorney-client privilege is quite indistinguishable, as the law intersects in all of its facets, and are viewed interchangeably.  *Bank of Am., N.A. v. Terra Nova Ins. Co. Ltd.*, 211 F. Supp. 2d 493, 495 (S.D.N.Y. 2002) ("New York law governing attorney-client privilege is generally similar to accepted federal doctrine.") (citations omitted).

*-15-*

1984)); *Madanes v. Madanes*, 199 F.R.D. 135, 143 (S.D.N.Y. 2001) (citing, *inter alia*, *In re Richard Roe, Inc.*, 68 F.3d 38, 39-40 (2d Cir. 1995) & quoting *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir.1961)); *see also* 8 WIGMORE, EVIDENCE § 2292 (McNaughton rev. ed. 1961).  This privilege, as previously stated, further attaches to the advice rendered by the attorney.  *In re County of Erie*, 473 F.3d 413, 418 (2d Cir. 2007) (citing *United States v. Constr. Prod. Research, Inc*., 73 F.3d 464, 473 (2d Cir. 1996) (listing the elements, including the requirement that include that the communication is made "for the purpose of obtaining or providing legal advice")); *In re Six Grand Jury Witnesses*, 979 F.2d 939, 943-44 (2d Cir. 1992).

Contrary to modern yet ill-informed perceptions, the attorney-client privilege is often "[n]arrowly defined, riddled with exceptions, and subject to continuing criticism."  *United States v. Schwimmer*, 892 F.2d at 243.  Grand as the privilege stands in our legal lexicon, it is nonetheless narrowly defined by both scholars and the courts.  *Univ. of Pa. v. E.E.O.C.*, 493 U.S. 182, 189 (1990); *In re County of Erie*, 473 F.3d at 418 (finding that the privilege is narrowly construed and "appl[ies] only where necessary to achieve its purpose") (citing, *inter alia*, *Fisher v. United States*, 425 U.S. 391 (1976)).  The attorney-client privilege does not give broad, unfettered latitude to every communication with a lawyer, but is to be narrowly construed to meet this narrowest of missions.  *Fisher v. United States*, 425 U.S. at 403 ("[S]ince the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose."); *see also In re Horowitz*, 482 F.2d at 81 (quoting 8 WIGMORE § 2292 at 70 for the proposition that the privilege ought to be "strictly confined within the narrowest possible limits consistent with the logic of its principle"); *United States v. Int'l Bhd. of Teamsters*, 119 F.3d at 214.

Based upon the above recitation of the law, it is evident that there is no blanket attorney-

client privilege that shields each and every document within an attorney's file.  Unless the document reflects either a communication seeking advice or an attorney providing advice, the privilege will not stand.  Here, facts, information, and business records, many of which were prepared as a part of or required for business transactions, are devoid of any confidential communication and thus are not protected by the attorney-client privilege.  Therefore, the Court is neither persuaded nor tempted to grant, as Bosman & Associates argues, that the attorney-client privilege protects all of its files.  Nor are we persuaded that Ryan is the sole owner of the attorney-client privilege.[9]

There are two distinct attorney-client privileges at play here: Ryan has a privilege as to his personal files and related communications and Prime Rate has a privilege as to its files, documents, and communications.  Speaking directly to Prime Rate, an LLC, the attorney-client privilege belongs to the corporation or similar organization.  *Orbit One Commc'ns. Inc. v. Numerex Corp.*, 255 F.R.D. 98, 104 (S.D.N.Y. 2008) (citing, *inter alia*, *Upjohn Co. v. United States*, 449 U.S. 383, 389-90 (1981)).  As we have already recognized above, Prime Rate stands independent of Ryan and is deemed to be a client as to its own files.  *See supra* Part II.A.  As the successor in interest, and as a matter of law, Levine, as Receiver, controls the attorney-client privilege for Prime Rate.  *United States v. Shapiro*, 2007 WL 2914218 (S.D.N.Y. Oct. 1, 2001) (where a receiver is appointed and granted broad powers, the receiver has the authority to waive the privilege); *see also Community Futures Trading Commc'n. v. Weintraub*, 471 U.S. 343 (1985) (finding that when control of a

---

[9] Bosman & Associates asserts that the Receiver can gather all of this information from other third parties without treading upon the attorney-client privilege.  But, as the Receiver points out, this would amount to a yeoman's task, especially when he does not possess the requisite information to look to others for this information, all, if not most, of which is within the firm grasp of Bosman & Associates.  The Receiver has no duty to pursue third party discovery from the 62 county clerks in the State of New York, any other county clerk throughout the country, or any other party for that matter, in order to ascertain information before seeking it from Bosman & Associates.

corporation passes to a new management, in that case a bankruptcy trustee, the authority to assert or waive the attorney-client privilege passes as well); *MacKenzie-Childs LLC v. MacKenzie-Childs*, 262 F.R.D. 242 (S.D.N.Y. 2009) (applying *Weintraub*, the court found that a limited liability corporation that was purchased during a bankruptcy proceeding was the successor in interest and could waive the privilege if it deemed it necessary); *Orbit One Commc'n Inc. v. Numerex Corp.*, 255 F.R.D. at 104 (standing for the proposition that successor management stands in the shoes of the prior management and controls the attorney-client privilege).

Should there linger any reservation as to whether retainer agreements, fee arrangements, client identities, and escrow deposits are not protected communications, under the attorney-client privilege, our discussion under the Fifth Amendment should dispel that misapprehension. *Newmarkets Partners, LLC v. Sal. Oppenheim Jr.*, 258 F.R.D. 95, 101 (S.D.N.Y. 2009) (citing *United States v. Pape*, 144 F.2d 778, 782 (2d Cir. 1944) & *In re Shargel*, 742 F.2d 61, 62 (2d Cir. 1984) for the proposition that retainer agreements and client's identities are not confidential communications made for the purpose of securing legal advice); *Allen v. West Point-Pepperell Inc.*, 848 F. Supp. 423 (S.D.N.Y. 1994) (retainer agreements are not privileged from discovery under the attorney-client privilege); *People v. Belge*, 59 A.D.2d 307, 308 (N.Y. App. Div. 4th Dep't 1907) (the retainer agreement is not privileged); *see also Spectrum Sys. Int'l v. Chem. Bank*, 78 N.Y.2d 371, 379 (1991) (citing *People v. Belge*).

With all of this being said, the attorney-client privilege does not stand as an impediment to Levine obtaining records and information relative to Prime Rate. And, if the attorney-client privilege does pose a problem, the Receiver, as successor manager, would have the power to waive the privilege. Since Levine was directed by the Preliminary Injunction to collect all business

records, he is within his rights to asks for these documents and data.

D.  Charging and Retaining Liens

We must now return to the original challenges registered by Bosman & Associates to unveiling records to Levine: Because legal fees in the amount of $32,604.67 are due and owing, the law firm possesses a charging and retaining liens as to the files within its possession.  Initially, when proffering these liens as an interdiction to Levine's quest for records and information, it appeared that the law firm was commingling the liens' theoretical underpinnings as if they were blended into a single legal lien or contingent upon the other.  However, during the Hearing, Bosman & Associate retreated from that notion and acknowledged that these liens are separate and distinct and arise from different legal reasoning, although both are commonly recognized as protecting lawyers in obtaining compensation for the legal work rendered by them.

A charging lien and a retaining lien are not the same and they serve different purposes.  One is derived from a statute, whereas the other is a long-standing common law right.  When pursuing recoupment of legal fees, a lawyer has three choices: retaining lien, charging lien, and a plenary action in *quantum merit*.  *Schneider, Kleinick, Weitz, Damashek & Shoot v. City of New York*, 302 A.D.2d 183, 186 (N.Y. App. Div. 2d Dep't 2002).  We commence our discourse with charging liens, recognizing that it is "a device to protect counsel against 'the knavery of his client,' whereby through his efforts, the attorney acquires an interest in the client's cause of action."  *Butler, Fitzgerald & Potter v. Sequa Corp*., 250 F.3d 171, 177 (2d Cir. 2001) (quoting, in part, *In re City of New York*, 5 N.Y.2d 300, 307 (1959)).  New York Judiciary Law § 475 pronounces that

> [f]rom the commencement of an action, special or other proceeding in any court or before any state, municipal or federal department, except a department of labor, or the service of an answer containing a counterclaim, the attorney who appears for a party has a lien upon his client's cause of action, claim or counterclaim, which

> attaches to a verdict, report, determination, decision, judgment or final order in his
> client's favor, and the proceeds thereof in whatever hands they may come; and the
> lien cannot be affected by any settlement between the parties before or after
> judgment, final order or determination.  The court upon the petition of the client or
> attorney may determine and enforce the lien.

Stated differently, an attorney appearing on behalf of a party in a litigation has a lien upon the client's cause of action, claim, or counterclaim, which is contingent upon a favorable verdict, decision, determination, or outcome.  "[T]he charging lien is a specific attachment to the funds which constitute the client's recovery." *Schneider, Kleinick, Weitz, Damashek & Shoot v. City of New York*, 302 A.D.2d at 188 (citing *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d at 177). A charging lien does not have the panoptic powers over all of the client's files, but, rather is a lien for services rendered in a particular action or proceeding upon the client's cause of action.  *In re Badger*, 9 F.2d 560, 561 (2d Cir. 1925).  Possession of the client's files is neither pertinent nor relevant when interposing this lien.  *Id.*

On the other hand, every attorney has a common-law retaining lien upon the books and records in his possession and such lien exists independently of the rights created by statute, the New York Judiciary Law § 475.  *Lerner v. Seigel*, 22 A.D.2d 816 (N.Y. App. Div. 2d Dep't 1964).  This lien is premised upon physical possession of files and records related to a client.  "The retaining lien gives an attorney the right to keep, with certain exceptions, all of the papers, documents and other personal property of the client which have come into the lawyer's possession in his or her professional capacity **as long as those items are related to the subject representation**." *Schneider, Kleinick, Weitz, Damashek & Shoot v. City of New York*, 302 A.D.2d at 186 (emphasis added).  As a general proposition, before a lawyer is required to surrender the files, which are subject to this lien, to either the client or a substituted attorney, the outstanding legal fees must be

paid or adequate security for the payment must be posted.  *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626-27 (2d Cir. 1991).  However,

> [a]n exception to the foregoing may be made when the client has an urgent need for the papers to defend a criminal prosecution and will be seriously prejudiced by withholding of them but lacks the means to pay the lawyer's fee and disbursements; in that event the court may in its discretion, after balancing the conflicting interests, require the lawyer to release the papers on reasonable conditions. . . . Such a release may be ordered, however, only upon the client's making a clear showing of the need for the papers, the prejudice that would result from denying him access to them, and his inability to pay the legal fees or post a reasonable bond.

*Pomerantz v. Schandler*, 704 F.2d 681, 683 (2d Cir. 1983) (citations omitted).

The *Pomerantz* exception has been considered in numerous cases within this Circuit where the client was attempting to gain access to its erstwhile lawyer's files, and our Receiver is asking this Court to employ the same balancing test.  *See, e.g.*, *Allstate Ins. Co. v. Nandi*, 228 F. Supp. 2d 445 (S.D.N.Y. 2002) (determining that a bond in the amount of 10% of the disputed amount was adequate); *Casper v. Lew Lierberbaum & Co., Inc.*, 1999 WL 335334, at *8 (S.D.N.Y. May 26, 1999) (ruling that there must be a clear showing of need and prejudice and the inability to pay the legal fees or the bond before the court may release the files without either a payment or bond); *United States v. J.H.W. & Gitlitz Deli & Bar, Inc.*, 499 F. Supp. 1010, 1015 (S.D.N.Y. 1980) (finding that the retaining lien did not attach to deposits into the attorney's escrow account); *Franklin, Weinrib, Rudell & Vassallo, P.C. v. Stellato*, 240 A.D.2d 301 (N.Y. App. Div. 1st Dep't 1997) (ruling that the retaining lien could not be justified when the files were clearly needed to prosecute a counterclaim for malpractice).

First, the Court addresses Bosman & Associates' charging lien.  Without supplying specifics to the Court, Bosman & Associates asserts that there may be a couple of lawsuits where a charging lien may be appropriate.  In one of these cases, Prime Rate has a counterclaim, which may be in the

*-21-*

throes of settlement negotiations, if it has not already been derailed by this litigation or one of the parties' bankruptcy proceedings. If the settlement comes to fruition, the clients have already agreed that Bosman & Associates would be entitled to one-half, which would also be a substantial contribution toward the outstanding legal bill. *Resolution Trust Corp v. Elman*, 949 F.2d at 626 (noting that either the court determines or the parties agree as to the value of the attorney's services). Levine does not contest Bosman & Associates' right to a charging lien as to each lawsuit where the attorneys were pursuing either a cause of action or counterclaim on behalf of Prime Rate, and if these facts are true, this Court concurs that a charging lien(s) would exist. But, again, the record reflects a paucity of facts as to these lawsuits, so the Court is not in the position, at this juncture, to confirm the charging liens. Bosman & Associates will have to provide this Court with further details in order for us to affirm these liens.

As to retaining liens, our analysis is more involved. In providing a scant survey of the related files, Bosman & Associates believes that there are 93 archived files and 38 current files. Regarding the former files, it begs the question of whether payment was received for each if indeed these files were archived. Presumably, an attorney would not archive or close a file unless some remuneration was received as to the specific legal task performed. Appreciating the legal maxim that the retaining lien remains viable only as long as those items are related to the subject representation, it is reasonable to conclude that no retaining lien is applicable to these 93 archival files. However, switching to the current files, payment or a bond would be in order before such files are released to the Receiver, unless the Receiver can clearly show need for the papers and/or information and the inability to pay or purchase a bond.

The record establishes that, at this juncture, Levine, as Receiver, is managing approximately

a dozen properties.  In his role, he has been collecting rent from some of these properties and may have taken possession of several bank accounts.  Levine proffered that he had approximately $30,000 in his possession, which, on its face, would seem to be adequate to pay the fee or procure a bond.  But, Levine stated that this sum of money will be needed in the near future for some other urgent necessities.  Monies will be needed to (1) maintain these properties, some of which are in dire straits, (2) pay the property managers, (3) pay for snow removal and like services at the properties; (4) pay accountants and lawyers; (4) purchase a boiler for one of the properties, and (5) seek reimbursement and payment for himself.  The grim reality is that, as Receiver, he is not flush with free-flowing resources nor confident that other new resources will be found, and is confronted with rapidly mounting debts and expenses, which at some point will dissipate these funds.  Pointing to both Judge Mordue's observation that there is a "strong public interest in recovering the Defendants' assets . . . [and] to obtain documents discovery from third parties," Dkt. No. 57 at p. 2, and the Second Circuit's dicta that "it is very much in the public interest to maximize the assets available to pay creditors," *Resolution Trust Corp*, 949 F.2d at 630, Levine contends that, in pursuing his obligations as Receiver under the Preliminary Injunction, he has been acting in the public interest.  Moreover, Levine would be substantially impaired in the pursuit of his mission without the information contained in the files.  *Id*.

Based upon the record before this Court, the Court finds that Levine has made a clear showing of his urgent need for the files and information contained therein, that he would be severely prejudiced if he was denied access thereto, and that he does not have the ability to pay the legal fees or post a reasonable bond.  In arriving at these findings, the Court takes into consideration that Bosman & Associates is not without some recourse because it has an uncontested charging lien on

at least one potential settlement and probably as to other pending lawsuits. The Court also weighs that Bosman & Associates is not being asked to provide a trove of documents nor incur expense and exceptional effort to produce. Essentially, Levine seeks a list of the files, a copy of the retainer agreement, information regarding the settlement offer, copies of the EMC mortgage file, a copy of pleadings handled by Attorney Steve Waite, a copy of the settlement with Sandy Horowitz, and information regarding deposits by Matthew Ryan and Prime Rate into the escrow account. This is neither an exceptionally long list nor an extraordinary burden to bear.[10]

E.  Conflicts of Interest

Lastly, Bosman & Associates evokes yet another rationale to preclude Levine from reviewing files and receiving information relative to Prime Rate, its assets and obligations. Bosman & Associates, joined by Ryan, declare that Levine has a "glaring" conflict interest on at least two accounts. Dkt. No. 52 at p. 11. The law firm exclaims that these conflicts of interest or appearances of a conflict are so conspicuous that "neither the Receiver, nor this Court can ignore [these] conflict[s] of interest." *Id*. The consequence of these alleged conflicts is that the Receiver may step into the shoes of Prime Rate and thus would have the ability to waive the attorney-client privilege much to the detriment of the Defendants and possibly the law firm. *Id*. at pp. 10-12. This Court does not intend to ignore any complaint of a conflict of interest and so an examination will ensue.

The first claim of a conflict of interest involves the purported past professional, albeit adversarial, relationship between Robert A. Bosman, the principal at Bosman & Associates who, from the record, may have been more instrumental and involved in Prime Rate's business dealings,

---

[10] The Court disagrees with Levine that the Securities Exchange Acts, specifically 15 U.S.C. §§ 77t(b) and 58(u)(d)(1), relieves him from posting a bond. These statutes exempt only the SEC from purchasing a bond upon a pursuit of a permanent or temporary injunction or restraining order.

and Levine in his role as an attorney.  In the past, it appears that Levine prosecuted two civil matters on behalf of his clients against Robert Bosman.[11]   Because of these two lawsuits Bosman & Associates opines that there is animus between these two lawyers and that Levine has an "obsession" with the files controlled and managed by Bosman & Associates.  *Id*. at p. 11.  The second charge of a conflict of interest, which Bosman & Associates finds to be more troubling, is that Levine's law firm now employs as a paralegal a former employee of its firm.  Bosman claims that this paralegal, when employed by it, was privy to Ryan's and Prime Rate's confidences and secrets and there would be "nothing restraining [the] paralegal . . . from sharing this information with her [current] employer, therefore jeopardizing the defendants' attorney-client privilege, client confidences and secrets as well as the 5th amendment rights of the Defendants."  *Id*.   Because of these asserted conflicts of interest, Bosman & Associates asks this Court to appoint a new Receiver.

Bosman & Associates' heightened concerns about Levine trampling upon its client's Fifth Amendment and attorney-client privilege, has already been profoundly ameliorated by the Court's rulings and findings above.  Ryan's Fifth Amendment privilege is not implicated as there is no indication that he has been compelled to incriminate himself in this process.  Further, his attorney-client privilege as to his personal communications regarding his personal files and transactions are not imperiled, therefore there is no apparent prejudice to him.  When the Court adjured Bosman & Associates to identify evidence of Levine's personal or professional animosity toward Robert Bosman, none was forthcoming.  The law firm could not provide any proof that would evince that Levine had any obsession with rummaging through the Bosman & Associates' legal files on behalf

---

[11]  Those two cases are as follows: *First Niagara Funding Inc. v. Aspen Hills II, LLC and Robert Bosman et al.*, which is still pending; and *First Niagara Bank v. Aspen Hills II, LLC, Robert Bosman, et al.*, which has settled.

of his client First Niagara Bank, or for any other client.  Levine assured the Court that he had neither personal nor professional hostility toward Robert Bosman.  Although the nature of those prior lawsuits was not revealed, Levine's only role was representing a client who had named Robert Bosman, along with others, as defendants.  Levine's assurances also included that he had not and does not intend to roam through Bosman & Associates' files seeking damaging information to use against him.

It is not infrequent for former litigants to retain their adversaries to work either for them on subsequent matters or to become their clients, notwithstanding previous litigation tensions.  Lawyers are also capable of compartmentalizing their respective roles when the situation present themselves, so that they do not engage in questionable concurrent or successive representations, although such type of representations are not alleged here.  Bosman & Associates did not provide any precedent to guide this Court in this analysis nor could the Court, after an extensive legal search, unearth any legal discussion that remotely touches the Levine/R. Bosman purported quandary.  The Court closely scrutinized the New York Rules of Professional Conduct and could not discern any conflict of interest that would reach a complaint such as this.  N.Y. COMP. CODES R. & REG., tit. 22 § 1200. Further, Bosman & Associates was unable to identify any actual prejudice, only abstract possibilities, which is not sufficient to find  a conflict.  An appearance of conflict of this nature is much too vague and alone is insufficient to warrant a court sanction without a showing of actual prejudice.  *People v. Herr*, 86 N.Y.2d 638, 641 (1995) (ruling that the appearance of impropriety alone is not sufficient to require sanction or disqualification in the absence of actual prejudice or substantial risk); *Essex Equity Holdings USA, LLC v. Lehman Bros., Inc*., 2010 WL 2331407, at *7 (N.Y. Sup. Ct. June 10, 2010) (citing, *inter alia*, *In re Stephanie X*., 6 A.D.3d 778, 780 (N.Y. App.

Div. 3d Dep't 2004) for the proposition that there must be a showing of actual prejudice). Conveniently, Bosman & Associates clings to this lawyers-nemesis portrait as a "matter of first impression," but such a portrayal is not enough to persuade this Court to set aside the Receivership on this ground.[12]

However, the issue regarding Levine's new paralegal, who at one time worked for Bosman & Associates, is more problematic, but is not without a solution. Levine represented, which was not controverted, that he has not spoken to this paralegal about her erstwhile duties and responsibilities with Bosman & Associates, nor does he intend to do so. He has neither inquired of her into any of Bosman & Associates' legal files or attorney-client privileged communications. Levine's law firm has formed a screening procedure, commonly known as a legal wall, to prevent such a disclosure as Bosman & Associates fears. Such procedures are prudent under these circumstances and should remain in effect. There should be no alarm that such a legal wall surrounding this paralegal would be impotent because of the size of the Levine law firm. Even a small law firm can erect appropriate and adequate isolation to protect the sharing of confidential information, as long as the firm exercises special care and vigilance. *See Essex Equity Holding USA, LLC*, 2010 WL 2331407, at *9-10. The Court is confident that Levine's law firm will continue to honor their obligation and avoid any impropriety.

### III. CONCLUSION

Levine is mandated to succeed Prime Rate's management and to collect all of its assets,

---

[12] It deserves mentioning, no matter the entreaty, that this Court is not empowered to remove Levine as Receiver. Such authority is reserved by Judge Mordue, who appointed Levine to serve in his legal capacity. Further, it is doubtful that Bosman & Associates has standing to make such a motion to Judge Mordue. On the other hand, Ryan may have standing but it should not be forgotten that he consented to Levine serving as Receiver. Prelim. Inj.

books and records, identify creditors and investors, preserve the *status quo* pending a disposition

of this litigation, pay all expenses, and employ his best judgement, including whether bankruptcy

should be contemplated.  Prelim. Inj., Sec. V.  By succeeding Ryan as the management of Prime

Rate, legally and fundamentally, Levine, as Receiver, is the client entitled to seek files from Prime

Rate's former attorney, Bosman & Associates, subject, in part, to a charging lien.  Neither Ryan's

Fifth Amendment, the attorney-client privilege, nor any perceived conflict of interest stand as legal

deterrence to Levine having access to files in Bosman & Associates' possession or to information

related to transactions on behalf of Prime Rate.

The Court finds that, based upon the parties' agreement, without any serious challenge from

the Receiver, that Bosman & Associates is owed $32,604.67.  Even though this amount of money

is due and owing and would be secured by a retaining lien in other circumstances, Bosman &

Associates' retaining lien is hereby waived because the Receiver has made a clear showing of an

urgent public interest need for these documents and information and his inability to pay the fee or

to purchase a security bond.  As to the assertion that Ryan and Prime Rate's firm are so intertwined

that they cannot be disentangled, the Court is persuaded otherwise and submits that the Prime Rate

files and information can be extricated from Ryan's personal manners with a modicum of diligence.

The Court assures Ryan that this exercise in sorting files will not be a vehicle to intrude into his

personal files, to compel incriminating communication, or to dispense with his personal attorney-

client privilege.  Therefore, Bosman & Associates shall provide the requested documents and

information within ten (10) days of the date of this Memorandum-Decision and Order.

Bosman & Associates' charging lien is preserved.  It is incumbent, however, that, Bosman

& Associates identify within ten (10) days of the date of this Memorandum-Decision and Order

those litigation files where it claims to have a charging lien.  Regarding the potential settlement where the parties have already agreed that should it come to realization, fifty (50) percent of the settlement would be paid to Bosman & Associates.  *Schneider, Kleinick, Weitz, Damashek & Shoot v. City of New York*, 302 A.D.2d 183 (N.Y. App. Div. 2d Dep't 2002) (ruling that all parties who may possess the settlement funds are on notice of an attorney's charging lien and are obligated to protect and honor that lien); *see also Tunick v. Shaw*, 45 A.D.3d 145, 148 (N.Y. App. Div. 1st Dep't 2007) (lien attaches to insurance proceed).  The Receiver should do all that is within its authority to assist in the negotiation and help secure the settlement and protect Bosman & Associates' charging lien.

Accordingly, the Receiver's Motion (Dkt. No. 17) is **granted** consistent with the rulings within this Memorandum-Decision and Order.

The Clerk of the Court is directed to mail a copy of this Memorandum-Decision and Order to Matthew John Ryan, 11 Lakeshore Drive, Troy, New York 12180-9722, The Bosman Law Firm, LLC, 6599 Martin Street, Rome, New York 13440, and Bosman & Associates, PLLC, One Executive Centre Drive, Suite 102, Albany, New York 12203.

**IT IS SO ORDERED**.

Albany, New York
October 20, 2010

RANDOLPH F. TREECE
United States Magistrate Judge